UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

OMAR TELLEZ,

                                    Civil Action No.
                                    15-cv-

                 Plaintiff,

    -against-                            COMPLAINT

OTG INTERACTIVE, LLC (n/k/a) FLO            JURY TRIAL DEMANDED
SOLUTIONS, LLC, OTG MANAGEMENT,
INC., and RICK BLATSTEIN (a/k/a)
ERIC J. BLATSTEIN

               Defendants.

-------------------------------------------------------------x

Plaintiff, OMAR TELLEZ, by his attorney, the Law Offices of Eric Dinnocenzo, for his

complaint against defendants OTG INTERACTIVE, LLC (n/k/a) FLO SOLUTIONS, LLC

and OTG MANAGEMENT, INC. alleges as follows:

## INTRODUCTION

1.  In late 2014, the corporate defendants, led by defendant Rick Blatstein (a/k/a) Eric

J. Blatstein as Chief Executive Officer, developed a strategy to illegally download and

commercially distribute videogames onto iPads they owned that were placed in the numerous

high-end restaurants it operated in major national airports. They planned to unlawfully

charge customers to play them in violation of copyright and trademarks held by Apple and

the videogame publishers. The fraudulent scheme was perpetrated by defendants while

acting as a contractor for major airlines that are publicly-traded, such as United Airlines

(NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL), and the iPads

were at all times branded with the airlines' trademarks and revenue collected from the video

games would have been shared by OTG with the airlines, with a total expected windfall of

$9.5 Million incremental annual revenue. When Mr. Téllez informed Mr. Blatstein about his objections to this unlawful activity, he was first demoted and then ultimately terminated, all within less than 10 days after engaging in protected activity. This case is a clear instance of corporate fraud and Mr. Téllez falls squarely within the protections of the Section 806 of the Sarbanes-Oxley Act ("SOX") and Section 922 of the Dodd-Frank Act ("Dodd-Frank"). . Defendants have also refused to pay plaintiff the severance to which he is contractually-entitled.

## PARTIES

2.      Plaintiff, Omar Tellez, is a resident of the State of New Jersey. He has experience as a high-profile executive in the technology industry.

3.      Defendant OTG Management, Inc. ("OTG") is a corporation duly organized under the laws of the state of Pennsylvania with its principal place of business in the County of New York, State of New York.

4.      Defendant OTG Interactive, LLC (n/k/a) Flo Solutions, LLC ("OTGI") is a foreign limited liability company duly organized under the laws of the state of Delaware with its principal place of business in the County of New York, State of New York.

5.      Upon information and belief, OTGI was created in 2014. Its purpose was to develop and maintain the technology platform that OTG uses in its iPads located in restaurants it owns and operates in U.S. airports. On February 13, 2015, OTGI changed its name to FLO Solutions, LLC. FLO is the name that OTGI used to refer to its technology platform. OTGI operated as an arm of OTG and was always under the management and

2

control of OTG. Further, persons employed by OTGI considered themselves to be employed by OTG and reported to and were supervised by its higher management.

6.     Defendant Rick Blatstein (a/k/a) Eric J. Blatstein ("Blatstein") is the Chief Executive Officer of OTG.

7.     Defendant OTG is the parent company to OTGI which is its subsidiary.

8.     Plaintiff was employed by defendants from August 8, 2014 to November 3, 2014.

9.     Plaintiff qualifies as an employee of defendants up until his termination on November 3, 2014, and defendants qualify as employers under the laws and causes of action set forth below.

10.    At all relevant times, Mr. Tellez reported to Mr. Blatstein who was his supervisor.

11.    Defendants OTG and OTGI are regulated by, and subject to, SOX.

12.    Defendants OTG and OTGI are regulated by, and subject to, Dodd-Frank.

## JURISDICTION AND VENUE

13.    Defendants regularly conduct a substantial amount of business in the Southern District of New York.

14.    Defendants have offices, employees and equipment that are located in the Southern District of New York. The headquarters and principal place of business of both OTG and OTGI are located in New York, New York.

15.    At the time plaintiff was terminated, his employment was based out of the Southern District of New York.

16.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, and

3

1343 and also under SOX and Dodd-Frank. This Court has supplemental jurisdiction over the non-federal law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because defendants reside there and because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and because defendants' contacts with the Southern District are sufficient to subject it to personal jurisdiction there if the district was a separate state.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.     On or about April 8, 2015, plaintiff filed a charge with OSHA (No. 2-4173-15-146) alleging defendants violated SOX against by retaliating against him and ultimately terminating his employment because he engaged in protected activity under the statute.

19.     More than 180 days passed from the filing of the charge and a final determination has not been reached. Accordingly, the plaintiff has the right to file a SOX retaliation cause of action in this Court. His other claims do not require the exhaustion of any administrative remedies or other prerequisites.

20.     The defendants have been provided with advance notice of plaintiff's intent to file this action.

## FACTUAL BACKGROUND

### Defendants' Business

21.     Pursuant to contracts with major airlines, OTG operates high-end restaurants in airports throughout the United States. It has placed Pads at restaurant tables with software that allows customers to place orders from their tables, check the status of flights and browse the Internet. Wherever the tabletop technology has been deployed, it is presented

4

to the end customer as a product from the airline with very clear branding from the airline. To the end user, the OTG platform and the airline seem to be one and the same. In fact, the iPad screens show the airline logo and not any OTG logo or identifier.

22.     OTG's website boasts of award winning restaurants, attractive locations and innovative use of technology to streamline, and make more enjoyable, the ordering and delivery of food and drink. According to OTG's website, it has more than 200 restaurant and retail locations in ten airports across North America. These include New York City (LGA, JFK and Newark), Minneapolis, Philadelphia, Toronto, Washington D.C., Chicago, Boston, Atlanta and Tucson.

23.     As part of its business plan, OTG has entered into contracts with multiple airlines that have leased space from various Port Authorities and governmental entities that control airline terminal space. Pursuant to OTG's contracts with the airlines, OTG designs, installs and operates the food and beverage concessions on behalf of the airlines at their terminal locations. To put it more simply, the Port Authorities and governmental entities lease space in the airport to the airlines which, in turn, leases part of that space to OTG to operate restaurants and other concessions. To receive this privilege, OTG allocates a share of its revenue earned in the space leased by the airline. OTG fulfills its role at the airport as a contractor to public companies such as United Airlines (NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL) among others.

24.     At all relevant times, OTG and OTGI were contractors of publicly traded companies, including without limitation United Airlines (NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL), among others, and were engaging in business that would benefit the publicly traded companies.

25.     Wherever OTG's tabletop technology has been deployed, it is presented to the end customer as a service from the airline with very clear branding and user experience delineated by the airline. When a customer interacts with OTG's table top technology, he/she is unaware that the service is being provided by OTG, but rather he/she believes that the service is being rendered by the publicly held airlines such as United Airlines (NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL) among others. In addition, the publicly held airlines benefit financially from any monetary transaction performed within OTG's tabletop technology. Specifically, in most instances, the arrangement involves OTG sharing some of its revenues with the airlines.

### Mr. Tellez's Employment

26.     On or about August 8, 2014, OTG provided Mr. Téllez with an offer letter that both parties signed that formed a mutually binding employment contract. The offer letter contained terms and conditions of employment that Mr. Tellez relied upon in deciding to enter into the employment with defendants.

27.     Pursuant to the contract, Mr. Téllez would begin working as President of OTGI on or before September 9, 2014. The position was offered to him by the CEO of OTG who is known as Rick Blatstein. He was formerly known as Eric J. Blatstein.

28.     Upon information and belief, he now uses the name Rick after going through a bankruptcy and having been found by the Third Circuit Court of Appeals to have engaged in fraudulent transfers of money to avoid paying back his creditors.

29.     Specifically, in the case of *In Re Eric J. Blatstein*, 260 B.R. 698; 2001 U.S. Dist. LEXIS 2952 (E.D. Pa March 19, 2001), the Third Circuit found that Mr. Blatstein transferred his income "with an actual intent to defraud his creditors." Ultimately, the

6

district court held, *inter alia*, that the Trustee was entitled to a judgment against Mr. Blatstein for the $1,533,428.65 that he fraudulently transferred to his wife between October 3, 1995 and December 19, 1996. This is the same Mr. Blatstein who is named as a defendant in this action.

30.     Immediately prior to his hiring by OTG, Mr. Téllez served as the President of Moovit, the fastest growing application and #1 application in the urban transportation space (known as "Waze for Public Transportation") and funded by the most prestigious venture capital firm in Silicon Valley: Sequoia Capital. Mr. Tellez left Moovit to work at OTG and OTGI based on the fraudulent inducements made by Mr. Blatstein who concealed his true identity and personal history as well as the actual type of work Mr. Tellez would be performing.

31.     Mr. Téllez was reasonably unaware of Mr. Blatstein's background when he accepted the position at OTG, which was not disclosed to him. If he had been aware of this background, he never would have left Moovit and accepted the position offered to him by Mr. Blatstein. Because he was fraudulently induced to begin working for defendants, he left his former employment and suffered losses and damages as a result of his termination by defendants. In other words, if he had known of Mr. Blatstein's background, he would have continued working at Moovit and been employed to this day. In addition, that Mr. Blatstein had this unsavory background is consistent with his unlawful actions as alleged in this action, and so the fraudulent inducement of Mr. Tellez had the outcome of him suffering damages and losses.

32.     The employment contract entered into on August 8, 2014 provided that Mr. Tellez would be paid an annual base salary and a quarterly bonus that would be targeted to

7

50% of the annual base salary. He was provided with employee benefits that were the same as similarly-situated OTG employees including health, dental, vision, life and disability, and participation in the 401k plan. He was granted Phantom Equity Interest in OTGI equal to 4% of its limited liability company interests which would vest over 4 years. He was also eligible for an additional 3% Phantom Equity Interest after one year.

33.     As a condition of the employment contract, Mr. Tellez was required to sign a non-compete agreement with OTG which was executed on August 8, 2014 by him and OTG.

34.     Pursuant to the contract, Mr. Tellez could not be terminated except for "cause." As is relevant here, "cause" is defined as "engagement in any course of conduct that could reasonably be expected to materially and adversely damage the business or reputation of the Company."

35.     If he was terminated by the employer without "cause," he was contractually entitled to one-year's salary, health benefits for one year, and the vested and unvested Phantom Equity Interest. As will be discussed, Mr. Tellez was terminated without "cause" and rather for engaging in protected activity under SOX and Dodd-Frank.

### Illegally Selling Videogame Usage on the Restaurant iPads

36.     After Mr. Téllez began his work for defendants, he began to study data maintained in OTG's data base called Mirus, as well as independently sourced information, and learned that OTG's proprietary table top ordering software was significantly increasing the sales of the restaurants that had implemented them.

37.     Around the time it hired Mr. Téllez, OTG entered into a contract with United Airlines (NYSE: UAL), the tenant at Terminal C of Newark Liberty Airport. OTG's role at Newark Liberty was to build out and operate on behalf of United Airlines (NYSE: UAL) a

precedent-setting array of high-end restaurants that would use OTG's proprietary tabletop ordering software for customers to order food and beverages, check the status of their flights and browse the web.

38.     Prior to Mr. Téllez's hiring, Mr. Lee, OTG's CTO, and Mr. Blatstein had spoken with Zynga (one of the largest digital game publishers in the U.S.) to explore whether Zynga would be interested in a partnership with OTG. The concept was that while people were ordering food and drinks on OTG's iPads, they would have the opportunity to play some of Zynga's games. Ultimately, in or about September 2014, Zynga declined to enter into a partnership with OTG.

39.     Early during his employment, Mr. Tellez informed Mr. Blatstein and other high-level OTG employees that significant revenue could be earned by making videogames available on the iPads in the airport restaurants and charging customers for their use. With roughly 6,000 tablets deployed and another 7,000 to be deployed at United Airlines Newark Terminal C, OTG stood to generate US $9.5 Million in incremental annual revenue, at a very high margin. [The calculation made by Mr. Tellez was that 13,000 iPads would generate \$2 per day (13,000 iPads generating \$2/day = 13,000 x \$2 x 365 = \$9.49 Million)]. This calculation was based on gaming revenue assumptions of other companies that had implemented videogames in this manner. Mr. Téllez's financial models, which were reviewed by OTG's CFO and presented to Mr. Blatstein, clearly highlighted that a portion of the revenue generated would have to be shared with the digital game publishers.

40.     Sometime in late October 2014, not long after presenting this analysis to Mr. Blatstein and before the launch of the United Airlines EWR Terminal C, Mr. Téllez ran into OTG's Director of Software Development, Nicholas Hauras, and OTG's Director of Project

9

Management, Greg Gallai, in OTG's kitchen. He noticed that they both appeared extremely alarmed and concerned. He learned from them that OTG's CTO had instructed them to create a mechanism that would allow OTG to fraudulently charge users to play games downloaded onto OTG's iPads at different airports, including the new United Airlines Terminal C deployment. The mechanism to charge users to play games is called a paywall.

41.     The two Directors had been asked to develop a paywall very similar to the one that Ziosk had developed and Mr. Téllez had shown Mr. Blatstein just a few days before. This paywall would enable OTG to illegally collect a fee every time a customer sought to play one of the games that had been pre-downloaded into one of OTG's iPads, which are fully branded to be perceived as an airline service. The two directors further told Mr. Téllez that the CTO had instructed them to create the paywall by reconfiguring the iPads (called "writing scripts") so that they would intercept the first external call (to specific websites of the game publishers) that the iPad would make once the customer clicked on the game or app icon. Once OTG's systems recognized these calls were being made from their systems, this would, as Mr. Téllez understood it from the Directors of Software and Project Management, bring up a paywall that would ask the user to pay in order to play the desired game or games. The challenge that both Directors described was that these initial calls (called pings) to specific websites (called URLs) were not public, and as such considerable "guess-timation" would have to be put in place to successfully implement this paywall.

42.     In short, after being rejected by Zynga for a legitimately arranged commercial use of games loaded into its iPads, and after understanding the very attractive economics that offering a "pay to play" model generated, OTG decided to offer the games on its iPads without obtaining permission from Apple or the game publishers. In doing so, it was

preparing to engage in an egregious violation of copyright and trademark laws. Not only was it going to allow an unlawful commercial use of the games, but it was going to charge customers to play those games and earn a windfall for itself and the airlines. Again, this plan was made in the context of OTG as contractor to various publicly traded airlines such as United Airlines (NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL) among others. The financial gain from the distribution of the games would flow up to the airlines as publicly-traded companies, thus ensnaring them in the corporate fraud.

43.     Upon information and belief, OTG intended to implement this fraudulent scheme across all of its iPads in all of its airport locations (approximately 6,000 tablets deployed and another 7,000 to be deployed at the forthcoming United Airlines Newark Terminal C deployment), and so the fraud would be perpetrated on a wide-scale. The user experience on these iPads is clearly aligned with the airline, because the iPad is branded with its trademark, i.e. the name, logo, look, feel, and color palette of the airline. The end user is blissfully unaware that the game is being provided by OTG, but rather is led to believe that it is provided by the publicly-traded airlines, i.e.: United Airlines (NYSE:UAL), JetBlue (NASDAQ:JBLU) and Delta Airlines (NYSE:DAL) among others.

44.     In fact, OTG has admitted that from October 30, 2014 to December 5, 2014, it illegally downloaded and sold videogame usage on its iPads at the Mill City Tavern Restaurant and Mill City Hold Room, which are restaurants it owned and operated at the Minneapolis-St. Paul Airport. The videogames included Sudoku Joy, Air Hockey, Iron Man 3, Candy Crush, Temple Run, BikeRace TFG, Slots Casino, Steam Poker Pro, Diamond Dash, Asphalt 8, Super Bingo HD; Bubble Island, and Jetpack Joyride. Upon information

11

and belief, it did not inform the videogame publishers or Apple of this scheme, did not share the revenue with the videogame publishers or Apple, and instead retained the revenue for itself and provided the publicly-traded airline with a share of the revenue.

45.    Accordingly, at the same time that defendants retaliated against and terminated Mr. Tellez for objecting to the paywall scheme, they were carrying out the scheme unbeknownst to him.

### How the Defendants' Actions Were Unlawful

46.    The unlawful activity occurred because all electronic games are protected by copyright and trademark laws. Further, the games are governed by an End User License Agreement ("EULA"). This EULA is agreed to by the owner of the electronic device at the time of downloading the game/app. The EULAs provide that the purchase of the game/app is just a license permitting personal use only – the game/app is not for commercial use, resale, distribution or use by anyone other than the owner of the electronic device into which the game/app has been downloaded and certainly cannot be sold or marketed for financial gain.

47.    Moreover, After OTG purchases iPads from Apple for use in its restaurants, and when it downloads games in the form of "apps," it electronically signs a EULA with Apple that would limit it from letting its customers play those games. If OTG wanted its customers to have lawful access to those games and/or charge its customers to play them while awaiting their food and beverage orders, it would need an express arrangement with the games' owners permitting the commercial use; a software license issued to a company for commercial use is referred to as an Enterprise License.

48.    In fact, there are two sets of EULAs that would apply to games played on

OTG's iPads. As stated, one EULA is directly transacted with the game publisher. The second is with Apple as the manufacturer and distributor of the iPad. This is because most game apps for iPads are purchased through the Apple Store. The game publishers typically pay Apple a fee (as much as 30% of the app's purchase price) for the privilege of being distributed through the Apple Store. The Apple Store requires all users who download games and other media to sign its own EULA, which also prohibits the rental, leasing, sale, transfer or other distribution of the game/app.

### Mr. Tellez Engaged in Protected Activity

49.     Mr. Tellez reasonably believed that defendants were violating SOX and Dodd-Frank, trademark and copyright laws, and the user agreements for the videogame publishers and Apple.

50.     Mr. Tellez further reasonably believed that OTG was instructing its staff to engage in wire fraud by, among other things, (1) hacking their iPads in order to intercept electronic communications between those iPads and the game providers whose apps had been downloaded into them, and (2) using electronic communications to illegally collect fees through a paywall. The purposes of these actions were to enable: (a) OTG's customers to play games in violation of copyright and trademark law and both the game providers' EULAs and Apple's EULA, and (b) OTG to illegally collect, retain and share with the airlines the illegal fees charged to its customers.

51.     Mr. Tellez reasonably believed that these actions would also constitute shareholder fraud and securities law violations because the airlines would be profiting from illegal activities. It was foreseeable that this unlawful scheme, conducted under the guise of the publicly traded airlines, could come to light and cause the publicly traded airlines to lose

13

customers and contracts, lose rights to terminals they rented at major airports, and cripple shareholder confidence and stain the companies' reputations.

52.     Further, he reasonably believed these actions could subject both OTG and the airlines to civil actions by corporations such as Apple and the game publishers.

53.     Mr. Téllez promptly sent an email to OTG's CTO objecting to the plan and illustrating, as an example, what the EULA of a leading game publisher, Electronic Arts, stated, which is that games can only be downloaded for personal non-commercial use. Mr. Téllez had actually learned from Mr. Hauras and Mr. Gallai that some of Electronic Arts' games were to be included in the paywall scheme.

54.     Mr. Téllez then went to the CTO's office to inquire about why the team had been asked to implement an illegal paywall in violation of the EULAs. The CTO stated that Mr. Blatstein had indeed requested this, as he wanted to monetize these games while they were preparing for the upcoming United Airlines EWR Terminal C launch. Mr. Téllez, having fiduciary responsibility for OTGI/FLO, asked the CTO if he was aware that OTG would be violating several EULAs and exposing the company to massive liability. The CTO said that while he was aware, it was not his call and that he was not willing to question a direct order by Mr. Blatstein.

55.     Immediately after this meeting, Mr. Téllez sent an email to OTG's General Counsel to inform him of these worrisome developments and get his coaching/guidance on how to manage this situation. Mr. Téllez specifically referred in this email to violation of the EULAs. Mr. Téllez also called Mr. Blatstein and informed him about the infringement on the games' EULA's.

56.     Shortly after Mr. Téllez had this communication with Mr. Blatstein about the

14

EULA violation, he called Mr. Téllez into his office. He was furious with Mr. Téllez for his objection to the fraudulent scheme, and informed him that going forward the CTO would no longer report to him. In so doing, Mr. Blatstein took an adverse action against Mr. Téllez by demoting him, and this was done in retaliation for having complained about the illegal use of the game apps.

57.     On November 3, 2014, approximately ten days (or less) after Mr. Téllez objected to the fraudulent scheme, Mr. Blatstein terminated Mr. Téllez.

58.     Mr. Tellez was terminated from his employment by defendants in direct retaliation for engaging in protected activity under SOX and Dodd-Frank.

59.     Defendants assert that Mr. Tellez was terminated for sharing inaccurate company information with Apple, but this excuse is pretextual and contradicted by other evidence. The information came directly from OTG's database. Before sharing the information, Mr. Tellez vetted it with OTG's CTO, CFO and other OTG executives who were familiar with OTG's Profit & Loss data. Moreover, emails sent by Mr. Téllez on OTG's email system demonstrate that Mr. Blatstein was well aware of Mr. Téllez's ongoing communication with Apple and even encouraged it. Furthermore, the morning of October 15, 2014, before sending the information to Apple, Mr. Téllez showed the information to Mr. Blatstein and told him that he was going to share it with Apple that afternoon.

60.     Defendants have refused to honor, and are in breach of the employment contract with Mr. Tellez. They have not paid him his severance, health benefits, or Phantom Equity that he is entitled to pursuant to the contract. This breach of contract was the result of unlawful retaliation for Mr. Tellez engaging in protected activity under SOX and Dodd-Frank.

## FIRST CAUSE OF ACTION: SOX

61.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

62.     Defendants are contractors, subcontractors or agents of publicly traded companies.

63.     All employees of contractors, subcontractors or agents of publicly traded companies are covered by the anti-retaliation protections of SOX, as was Mr. Tellez in this case.

64.     Contractors, subcontractors or agents of publicly-traded companies may not retaliate against *any* employee who engages in protected activity, no matter what the surrounding context.

65.     Mr. Téllez was demoted and then terminated by defendants, and then they refused to pay him severance, health benefits or Phantom Equity, in retaliation for his engaging in protected activity under SOX.

66.     Defendants knew or should have known that Mr. Tellez engaged in protected activity.

67.     Mr. Tellez had a reasonable and good-faith belief that defendants were engaging in or about to engage in unlawful activity that would constitute a violation of SOX, i.e. shareholder fraud and wire fraud.  In fact, Mr. Tellez had a subjective and objective basis for his beliefs.

67.     Further, this unlawful activity was planned or carried out in the context of defendants operating as contractors, subcontractors or agents for publicly traded companies.

68.     Plaintiff has been harmed by reason of defendant's conduct in violation

16

of SOX, and he has suffered losses and damages.

## SECOND CAUSE OF ACTION: DODD-FRANK

69.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

70.     Mr. Tellez reasonably believed that defendants engaged in activity that violated Dodd-Frank and also violated the securities laws, rules, and regulations.

71.     Mr. Tellez engaged in protected activity by complaining about or objecting to this activity to Mr. Blatstein and other high level employees at OTG.

72.     Mr. Tellez acted in good faith.

73.     Mr. Tellez is a whistleblower under Dodd-Frank or is otherwise protected by its anti-retaliation provisions.

74.     Mr. Tellez made disclosures that are protected under or required by SOX.

75.     Defendants knew or should have known of the protected activity.

76.     As a result of his protected activity, Defendants demoted and then terminated Mr. Tellez, and refused to pay severance, health benefits and Phantom Equity, in retaliation for his protected activity.

77.     Mr. Tellez has been harmed by reason of defendant's conduct in violation of Dodd-Frank, and he has suffered losses and damages.

## THIRD CAUSE OF ACTION: BREACH OF CONTRACT

78.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

79. There was a binding employment contract between Mr. Tellez and defendants, or at least it constituted an employment agreement that vested Mr. Tellez with rights. The employment contract set forth limitations on whether defendants could terminate Mr. Tellez.

80. Mr. Tellez accepted his employment with defendants in reliance on the promises and obligations set forth in the contract.

81. Defendants breached the contract by terminating Mr. Tellez without cause and then refusing to pay his severance, health benefits and Phantom Equity.

82. Defendants breached the duty of good faith and fair dealing by misrepresenting or failing to disclose Mr. Blatstein's background and by unlawfully retaliating and discriminating against Mr. Tellez so as to undermine and defeat the contract.

83. As a result of the breach of contract by defendants, Mr. Tellez has suffered damages and losses.

**FOURTH CAUSE OF ACTION: FRAUDULENT INDUCEMENT**

84. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

85. Defendants made false statements of material facts or knowingly concealed and misrepresented material information to Mr. Tellez concerning both Mr. Blatstein's background and the type of work he would be performing for defendants.

86. If the true facts had been revealed to Mr. Tellez, he never would have left his employment at Moovit to work for defendants. If Mr. Tellez knew of Mr. Blatstein's background or that he was supposed to be part of a scheme to develop a paywall to generate revenue from the illegal download and sale of videogames, he would never have left his employment at Moovit.

18

87.     The defendants intended to defraud Mr. Tellez and, in doing so, got him to leave his position at Moovit.

88.     Mr. Tellez reasonably relied on the representations made by defendants.

89.     Mr. Tellez suffered damages and losses in that he would have continued to receive salary and other benefits from Moovit to the present date and beyond, and as he has not been able to secure similar employment.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests the Court to enter judgment in her favor and against defendant, and to accord her the following relief:

(a)     A declaration that defendants, through their conduct and actions, have committed unlawful discrimination or retaliation under SOX and Dodd-Frank or allowed it to occur;

(b)     An injunction or order prohibiting defendants from committing or allowing any further discrimination or retaliation against plaintiff;

(c)     An award of actual damages including back pay with prejudgment interest, fringe benefits, and for all other damages proven at trial;

(d)     Double back pay under Dodd-Frank;

(e)     Reinstatement or front pay and benefits to the extent reinstatement is not feasible;

(f)     Compensatory damages for plaintiff's non-economic injuries, including emotional distress;

(g)     An award for severance, health benefits, and Phantom Equity;

(h)     An award of reasonable attorney's fees;

(i)     Interest, costs and disbursements; and

(j)     Such other legal and equitable relief or may be just and proper under the
circumstances.

Dated:     New York, New York
           November 16, 2015

                              LAW OFFICES OF
                              ERIC DINNOCENZO

By:        _____

                              Eric Dinnocenzo  (ED 3430)
                              Attorney for Plaintiff
                              469 Seventh Avenue
                              Suite 1215
                              New York, NY 10018
                              (212) 933-1675
                              eric@dinnocenzolaw.com