UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

OMAR TELLEZ,

       Plaintiff,

  -v-                                              No.  15 CV 8984-LTS

OTG INTERACTIVE, LLC, et al.,

       Defendants.

--------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

        Plaintiff Omar Tellez brought this action against his former employer, OTG Interactive, LLC ("OTGI"), two related corporations, OTG Management, Inc. ("OTG"), and OTG Management, LLC ("OTG LLC"), as well as the Chief Executive Officer of OTG, Rick Blatstein (a/k/a Eric J. Blatstein) (collectively, "Defendants"), alleging that Tellez's demotion and ultimate termination from Defendants' employ violated the Sarbanes-Oxley Act ("SOX"), the Dodd-Frank Act ("Dodd-Frank"), and the severance provisions of Tellez's employment contract, and that Tellez was fraudulently induced to join OTGI.  This Court has jurisdiction of the SOX and Dodd-Frank claims pursuant to 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

        Before the Court is Defendants' partial motion to dismiss the SOX and Dodd-Frank claims, as well as the fraudulent inducement claim, for failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6).  Since Defendants filed their motion to dismiss, Plaintiff has amended his pleading on consent, and the operative complaint is now the Second Amended Complaint ("SAC").  (Docket entry no. 20.)  The SAC added OTG LLC as a named

party, and added some further factual allegations, to which Defendants responded in their reply memorandum of law in support of the instant motion. (See docket entry no. 29.) Accordingly, the Court deems the motion to be made against the operative SAC.

The Court has carefully considered the submissions of both parties. For the reasons that follow, Defendants' motion is granted in part and denied in part.

### BACKGROUND

The following facts are drawn from the SAC and are taken as true for purposes of this motion to dismiss.

In August 2014, Tellez received a letter from OTG and Blatstein offering Tellez the position of President of OTGI.[1] (SAC ¶¶ 31-32.) Tellez signed that letter, which set forth the various terms and conditions of his employment, including a severance package that Tellez would be paid if he were to be terminated without cause. (SAC ¶¶ 31, 40.)

Tellez alleges that Blatstein, the CEO of OTG, concealed from Tellez the facts that he had previously filed for personal bankruptcy and had been found to have made fraudulent transfers of his income prior to Tellez' acceptance of OTG's offer of employment at OTGI. (SAC ¶¶ 33-34.) Tellez alleges that he would not have accepted OTG's offer of employment had he known of Blatstein's background, and that he would have continued working for his former employer, a technology company. (SAC ¶ 36.)

Around the time of Tellez's hiring, OTG contracted with United Airlines, a

---

[1] Plaintiff alleges generally that he was employed by all defendants (SAC ¶ 41), even though he also alleges that his position was President of OTGI (SAC ¶ 32). Defendants do not contest this allegation here, and the Court assumes for the purposes of the instant motion that each Defendant was Plaintiff's employer.

publicly traded company, to operate restaurants in Terminal C of Newark Liberty Airport that would use OTG's iPad-based tabletop ordering software, but carry the branding of the airlines operating in the terminal.[2] (SAC ¶¶ 42, 46.) OTG had previously sought to enter into a partnership with Zynga, a digital game publisher, to make Zynga's games available on OTG's restaurant iPads, but Zynga declined the offer. (SAC ¶ 43.)

The SAC is not clear as to whether Tellez knew of this prospective deal, but does allege that Tellez independently proposed the addition of gaming software to OTG's iPads. (SAC ¶ 44.) Tellez alleges that his analysis demonstrated that OTG could earn approximately $9.5 million in annual revenue from gaming software, a portion of which Tellez expected would be shared with the games' publishers. (Id.)

Tellez alleges that, shortly after proposing the addition of gaming software to Blatstein, Tellez learned from OTG employees that they had been instructed to develop software that would allow OTG to charge its customers to play games that OTG had downloaded onto the iPads in its restaurants. (SAC ¶ 45.) Tellez alleges that OTG intended to charge customers for using the iPad games without receiving the prior permission of Apple, Inc. ("Apple"), or the games' publishers. (SAC ¶ 47.) Tellez also alleges that OTG did in fact deploy the paid gaming software on some of OTG's iPads in two restaurants in the Minneapolis-St. Paul Airport for approximately 36 days in 2014, and (on information and belief) that OTG did not obtain permission to do so from Apple or the games' publishers, nor did OTG share the revenue it generated with Apple or the games' publishers. (SAC ¶ 49.)

Tellez alleges that he believed these actions violated SOX and Dodd-Frank (as

---

[2]  The SAC also alleges generally that OTG intended that its iPads would be used by Delta Airlines and JetBlue, which are also both publicly traded companies.

well as other laws and private contracts), and that OTG was engaging in wire fraud by charging users to play games on OTG's iPads.  (SAC ¶¶ 58-59.)  Tellez raised these concerns with OTG's Chief Technology Officer ("CTO"), stating that he believed OTG's plans ran afoul of the game publishers' end-user license agreements ("EULAs"), which provided for solely personal, non-commercial use.  (SAC ¶¶ 62-63.)  The CTO told Tellez that the directive to implement the paid gaming had come from Blatstein.  (SAC ¶ 63.)  Tellez then communicated his concerns to OTG's general counsel and to Blatstein, who shortly thereafter allegedly demoted Tellez by stating that OTG's CTO would no longer report to Tellez.  (SAC ¶ 65.)  Approximately ten days later, Tellez was terminated by Blatstein, allegedly for sharing inaccurate company information with Apple, a reason Tellez claims was pretextual.  (SAC ¶¶ 66, 68.)

## DISCUSSION

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  This requirement is satisfied when the factual content in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. 544, 556 (2007)).  A complaint that contains only "naked assertions" or "a formulaic recitation of the elements of a cause of action" does not suffice.  Twombly, 550 U.S. at 555, 557.  The Court accepts as true the non-conclusory factual allegations in the complaint and draws all inferences in the Plaintiff's favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Plaintiff's SOX and Dodd-Frank Claims

Section 806 of SOX protects employees of publicly traded companies, and employees of contractors and agents of publicly traded companies, against retaliation where such an employee provides information regarding conduct the employee reasonably believes is in violation of certain federal criminal statutes.  18 U.S.C. § 1514A(a).  Defendants assert that Tellez does not state a claim under SOX because OTG was not a publicly traded company or the contractor or agent of such a company as required by Section 1514A, and because the activity Tellez complained of fails to allege conduct that implicates SOX.

The Supreme Court recently made clear that Section 1514A prohibits a public company's contractor from "retaliat[ing] against [the contractor's] own employee for engaging in protected whistleblowing activity."  Lawson v. FMR LLC, 134 S. Ct. 1158, 1166 (2014).  Section 1514A defines the scope of protected activity as reports of "conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commssion, or any provision of Federal law relating to fraud against shareholders."  18 U.S.C. § 1514A(a)(1).

Here, the SAC pleads that OTG is a contractor of publicly traded airlines.  Under Lawson, a public company's privately owned contractor may be liable for retaliatory action taken against that private company's employees.  134 S. Ct. at 1166 ("A contractor may not retaliate against its own employee for engaging in protected whistleblowing activity.").  Lawson does not, however, specifically address the showing a plaintiff must make in order to establish that a private company is a 'contractor' of a public company for purposes of Section 1514A.  Rather, the Lawson Court noted, in dicta, several potential "limiting principles" on its holding

that were advocated by the Solicitor General, including the requirement that the contractor be "fulfilling its role as a contractor for the public company" in engaging in the conduct complained of by the putative whistleblower.  Id. at 1173.

Other courts have, since Lawson, have addressed the scope of the 'contractor' provision in Section 1514A.  In Gibney v. Evolution Marketing Research, LLC, 25 F. Supp. 3d 741 (E.D. Pa. 2014), the plaintiff alleged that his employer, a private contractor of a public company, was fraudulently billing the public company.  Id. at 742.  The Gibney Court held that these allegations did not state a claim under Section 1514A, in part because "in enacting SOX Congress was specifically concerned with preventing shareholder fraud either by the public company itself or through its contractors."  Id. at 747.  Similarly, in Anthony v. Northwestern Mutual Life Ins. Co., 130 F. Supp. 3d 644, 652 (N.D.N.Y. 2015), the court considered a plaintiff's allegations that she was terminated in retaliation for reporting that her employer, a private company that provided compliance services to a mutual fund company, had internal compliance issues.  Id. at 647.  The Anthony Court held that these allegations did not state a claim under Section 1514A because the statute is limited "to situations where a contractor employee is functionally acting as an employee of a public company, and in that capacity, is a witness to fraud by the public company."

Read in the light most favorable to Plaintiff, the SAC alleges that publicly traded airlines contracted with OTG to have OTG provide restaurant and entertainment services to those airlines' customers at airport terminals.  The SAC alleges that OTG engaged in conduct amounting to wire fraud – misrepresenting OTG's compliance with the terms and conditions of the software it provided on iPads in the course of selling that software to customers – and that this fraudulent activity was done in the course of OTG's fulfilment of its contractual duty to

provide services to the publicly traded airlines' customers (i.e., within the scope of OTG's role as contractor to the public companies). Plaintiff also alleges that he reported this alleged fraud to his supervisor, and was demoted and later fired as a result. Under these circumstances, Plaintiff has plausibly alleged that he engaged in protected activity under SOX.

Accordingly, Defendants' motion to dismiss Plaintiff's first claim for relief, under SOX, is denied. Because Plaintiff's claim under Dodd-Frank is premised on Plaintiff having made a disclosure protected under SOX (see SAC ¶ 84), Defendants' motion to dismiss the second claim for relief is similarly denied.

Plaintiff's Fraudulent Inducement Claim

Plaintiff asserts that, by concealing Blatstein's past bankruptcy and the true nature of the work Tellez would be performing for OTG, the Defendants fraudulently induced Plaintiff to accept OTG's offer of employment, and that Plaintiff would otherwise have remained at his prior job. The parties agree that New York law governs in this case. Under New York law, a party seeking to establish a fraud claim independent of a breach of contract claim in the employment context must plead an "injury independent of termination." Smalley v. Dreyfuss Corp., 10 N.Y.3d 55, 59 (2008).

Plaintiff, relying on Laduzinski v. Alvarez & Marsal Tax and LLC, 132 A.D.3d 164 (1st Dep't 2015), asserts that this injury requirement may be satisfied by a showing that Plaintiff lost the benefits of his prior employment. In Laduzinski, the plaintiff alleged that he was lured away from his job under false pretenses, specifically that the defendants hired him solely to get access to his contacts. The court held that this allegation was sufficient, because it established both a separate injury (the loss of the benefits of the plaintiff's prior employment)

and relied on actionable present statements, rather than future expectations. Id. at 168. As a general matter, fraudulent statements intended to lure an employee away from his current employer may support damages for the "injuries that resulted from [the employee's] reliance on the defendants' false statements," even though the plaintiff is not permitted to recover duplicative damages "for injuries caused by her termination." Stewart v. Jackson & Nash, 976 F.2d 86, 88 (2d Cir. 1992). Here, Plaintiff's fraudulent inducement claim relates to injuries separate and distinct from his termination, and therefore is not impermissibly duplicative of his breach of contract claim.

Under New York law, to plead a claim of fraudulent inducement by omission, a party must allege facts supporting each of the following four elements: "(1) the opposing party's concealment of information that she had a duty to disclose; (2) the opposing party's intention to defraud, or scienter; (3) the pleading party's reliance on his resulting mistaken impression; and (4) damages." Nash v. The New School, No. 05 CV 7174, 2009 WL 1159166, at *3 (S.D.N.Y. Apr. 29, 2009).[3]

Plaintiff alleges that Defendants concealed two facts during the course of his

---

[3] Fraudulent inducement claims are additionally subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To comply with Rule 9(b), a complaint alleging fraudulent misrepresentation under New York law must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). In cases involving fraud by omission, "the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud." Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A., 244 F.R.D. 204, 213 (S.D.N.Y.2007) (internal quotation marks omitted).

employment negotiations: (1) Blatstein's prior bankruptcy, and (2) OTG's intentions to deploy allegedly improper gaming to its iPads.  Defendants have moved to dismiss this claim on the grounds that neither of these allegedly concealed facts is sufficient as a matter of law to support a claim for fraudulent inducement because there was no relationship between Plaintiff and Defendants that would have given rise to a duty to disclose.  See, e.g., Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("A duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well.").  The New York Court of Appeals has recognized that a duty to disclose "has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance . . . is justified." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996).

        Here, Plaintiff has failed to plead facts that plausibly demonstrate that this was anything other than an arms-length contract negotiation between himself and Defendants regarding Plaintiff's potential employment at OTGI.  Plaintiff has not identified any basis to conclude that Defendants were in a special position of trust and confidence that would have imposed upon them a duty to disclose; indeed, Plaintiff's opposition to the instant motion makes no argument that such a duty existed except by making an inapposite analogy to Defendants' disclosure obligation under Federal securities laws, which are irrelevant to the existence and scope of any duty owed between the parties here.  (See docket entry no. 26, Pl. Mem. in Opposition, at 20-23.)  Under the circumstances alleged, Defendants had no affirmative duty to disclose to Plaintiff, during the course of negotiations over his employment contract, the allegedly material information Plaintiff identifies.  See id.  Plaintiff's fourth claim for relief, for

fraudulent inducement, is therefore dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's fourth claim for relief in the SAC is granted, and Defendants' motion is otherwise denied. This Memorandum Opinion and Order resolves docket entry no. 8.

The initial pre-trial conference in this matter is hereby re-scheduled to **November 4, 2017, at 11:30 a.m.**

SO ORDERED.

Dated: New York, New York
September 26, 2016

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge