UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

OMAR TELLEZ,

      Plaintiff,

 -v-                                              No. 15 CV 8984-LTS-KNF

OTG INTERACTIVE, LLC, et al.,

      Defendants.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

      Plaintiff Omar Tellez brought this action against his former employer, OTG Interactive, LLC n/k/a Flo Solutions, LLC ("OTGI"), two related corporations, OTG Management, Inc. ("OTG"), and OTG Management, LLC, as well as the Chief Executive Officer of OTG, Rick Blatstein a/k/a Eric J. Blatstein (collectively, "Defendants"), alleging that Tellez's demotion and ultimate termination from OTGI violated the Sarbanes-Oxley Act ("SOX"), the Dodd-Frank Act ("Dodd-Frank"), and the severance provisions of Tellez's employment contract. This Court has jurisdiction of the SOX and Dodd-Frank claims pursuant to 28 U.S.C. § 1331 and may exercise supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367.

      Before the Court is Defendants' motion for summary judgment dismissing all of Tellez's claims, as well as Tellez's cross-motion for partial summary judgment on his breach of contract claim. (Docket entry nos. 53, 59.) The Court has considered all of the parties' submissions carefully and, for the reasons that follow, Defendants' motion for summary judgment is granted to the extent that it seeks dismissal of Tellez's SOX and Dodd-Frank claims. Because the pleadings are insufficient to demonstrate that the Court has independent subject matter jurisdiction of Tellez's breach of contract claim, the Court declines to consider at this time

the parties' motions for summary judgment with respect to that state law claim and instead grants Tellez an opportunity to file an affidavit demonstrating a basis for subject matter jurisdiction in this Court.

BACKGROUND

Unless otherwise indicated, the following material facts are undisputed.[1] Defendant OTG operates restaurants and concessions in various airports throughout North America by providing Apple iPad stations that allow customers to, among other things, order food and check their flight status. (Docket entry no. 54, Def. 56.1 St. ¶ 1.) Defendant OTGI provides the software system used on the iPads. (Id. ¶ 2.) Defendant Blatstein is the Chief Executive Officer of OTG and OTGI. (Id. ¶ 3.)

On September 9, 2014, Tellez commenced his employment as President of OTGI pursuant to an employment agreement dated August 8, 2014. (Id. ¶ 8, 12; see also docket entry no. 48, Schmidt Decl. Ex. K, the "Employment Agreement.") Tellez's employment agreement provides that "[i]n the event of a termination of your employment with [OTGI] for reasons other than "Cause" (if initiated by [OTGI] or its parent) . . . we will provide you with a severance of twelve (12) months base salary and health benefits." (Employment Agreement ¶ 6.) The agreement defines "cause" as including, among other things, the "engagement in any course of conduct that could reasonably be expected to materially and adversely damage the business or reputation of [OTGI]." (Id. ¶ 6a.)

---

[1] Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

In the fall of 2014, shortly after Tellez joined OTGI, Defendants decided to implement a "model test" to determine whether OTGI could generate additional revenue by charging customers for games offered on Defendants' iPads. (Def. 56.1 St. ¶ 28.) As part of the test, Defendants developed a software application that would launch a paywall asking for payment before directing a customer to certain games. (Id. ¶¶ 30-32.) Once a payment was made, the application would launch a game already downloaded onto the iPad. (Id. ¶ 33.) The paywall test was implemented at a Delta airlines concourse in the Minneapolis-St. Paul International Airport for a five-week period from October 30, 2014, to December 5, 2014, on iPads that displayed the Delta logo. (Id. ¶¶ 40, 43.) Delta did not request or direct Defendants to conduct the paywall test, nor was Delta aware that any such test had been created or implemented. (Id. ¶¶ 45-46.)

On October 16, 2014, individuals from the Defendants' software development team approached Tellez to discuss their concern that the paywall model test might breach third-party licensing agreements between Defendants and certain iPad game manufacturers. (Id. ¶ 51.) That same day, Tellez emailed Defendants' General Counsel Christopher Redd to notify Redd of Tellez's concern that the paywall test might breach Defendants' obligations under licensing agreements with certain game manufacturers. (Id. ¶¶ 7, 56-57.) Tellez also approached Defendants' Chief Technology Officer, Albert Lee, about the same concern regarding Defendants' licensing agreements. (Id. ¶¶ 58-59.) Tellez contends that, during an in-person meeting with Lee, he informed Lee "of the illegality of the work that was being done" and that the paywall "was fraudulent and illegal."[2] (Schmidt Decl. Ex. F ("Tellez Dep.") at 29-30, 41.)

---

2    When asked what aspect of the paywall Tellez considered "illegal," he testified that "[i]t was pretty clear that [the paywall] was illegal and there were red flashing lights about it. End user license agreements from both Apple and these game publishers . . . forbid in a very clear sentence to commercialize these games and charge for them. This is standard

In addition to contacting Redd and Lee, Tellez also called Blatstein on October 16, 2014. (Def. 56.1 St. ¶ 60.) During that conversation, Tellez notified Blatstein about his belief that Defendants were breaching certain licensing agreements "and had created some hacking scripts to do so." (Tellez Dep. at 44, 64.) After notifying Redd, Lee, and Blatstein of his concerns, Tellez instructed members of Defendants' software team to stop development of the software application for the paywall test. (Tellez Dep. at 45-51.)

On October 17, 2014, Blatstein met with Tellez and was "completely infuriated because [Tellez] had stopped [the] development [of the paywall]." (Tellez Dep. at 66.) Tellez's employment with Defendants was terminated on November 3, 2014. (Def. 56.1 St. ¶¶ 12, 74.) The parties dispute the reasons for Tellez's termination. Defendants contend that Tellez was terminated because, among other things, Tellez's performance was "scattered" and "lacked focus," because Tellez lacked familiarity with certain financial concepts, and because Tellez was aggressive towards and shared inaccurate information with Apple, an important business partner. (See id. ¶¶ 18-27, 75.) Tellez contends that he was terminated because he raised concerns about Defendants' "illegal and fraudulent scheme" to commit wire fraud, and argues that Defendants' proffered reasons are pretextual. (Docket entry no. 75, Pl. Mem. at 24-30.) In support of that contention Tellez cites, among other things, positive communications between Blatstein and Tellez, as well as testimony from co-workers acknowledging that Tellez's presentations were "strong," that there was a "learning curve" associated with Tellez's role at OTGI, and assertions

---

procedure for any game publishing company. This is an obscene violation of their intellectual property rights." (Tellez Dep. at 42.) Software developer Gino Wu testified that it "felt dishonest" to charge users for the games, and that he and other members of the software development team "felt like it was not right to do." (Docket entry no. 74, Dinnocenzo Decl. Ex. E ("Wu Dep.") at 20-21, 35-36.) Wu also testified that he was concerned the paywall might not be "legal." (Wu Dep. at 41.)

that Apple's sales of iPads to Defendants were not affected by Tellez's communications with Apple. (Pl. Mem. at 26, 28-29, 32-33.)

DISCUSSION

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). By contrast, if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Sarbanes-Oxley Act

Section 806 of SOX protects employees of publicly traded companies, and employees of contractors and agents of publicly traded companies, against retaliation where the employee has provided information to supervisors about conduct that the employee "reasonably believes constitutes a violation of [18 U.S.C.] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission ["SEC"], or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C.S. § 1514A(a)(1) (LexisNexis 2008). To succeed on a claim under Section 806, an employee "must prove by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew that [he] engaged in the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the

unfavorable action."  Bechtel v. Admin. Review Bd., U.S. Dep't of Labor, 710 F.3d 443, 447 (2d Cir. 2013).

Defendants argue that summary judgment is warranted because OTGI is not a publicly traded company, and Plaintiff has failed to adduce any evidence that OTGI was acting on behalf of Delta, a public company, when implementing the paywall model test.  Citing the Supreme Court's decision in Lawson v. FMR LLC, 571 U.S. 429 (2014), Tellez argues that Section 806 does not require that fraud be carried out at the direction of, or for the benefit of, a publicly traded company and that, even if such a requirement were imposed, evidence of Defendants' contractual relationship with Delta is sufficient to show that OTGI operated as Delta's contractor when implementing the paywall model test.  Under Lawson, a public company's privately-owned contractor may be held liable for retaliatory action taken against that private company's employees.  Id. at 441 ("A contractor may not retaliate against its own employee for engaging in protected whistleblowing activity.").  In Lawson, the Supreme Court held that the SOX claim against the private contractor, which managed a publicly-traded mutual fund and had been accused by its employee of deception directed toward shareholders of the fund, was a "mainstream application" of SOX's prohibition.  Id. at 454.  Declining to determine "the bounds" of SOX liability of a contractor for retaliating against its own employees, the Court noted arguments that any potential overbreadth in subjecting a privately-owned contractor to liability for actions taken toward its own employees might be addressed by "limiting principles," including a requirement that the contractor be "fulfilling its role as a contractor for the public company" in engaging in the conduct complained of by the putative whistleblower.  Id. at 453-54.  Courts evaluating SOX claims against private contractors have since applied this limitation, recognizing that SOX, which was enacted in response to the Enron accounting fraud scandal, is

principally focused on protecting public company and contractor employees who reveal fraud committed by or on behalf of the public company. See Baskett v. Autonomous Research LLP, 2018 WL 4757962, at *8 (S.D.N.Y. Sept. 28, 2018) ("[T]he contractor provision does not apply where a public company has no involvement in the conduct Congress sought to curtail by passing SOX.") (citing cases).

Here, it is undisputed that Delta did not request or direct Defendants to conduct the paywall model test, nor was Delta aware that any such test had been created or implemented. (Def. 56.1 St. ¶¶ 45-46.) Although Defendants contracted with Delta to provide restaurant and concession services to Delta's customers, and Delta stood to benefit financially from that arrangement, the record contains no facts from which a reasonable juror could infer that the paywall model test, of which Delta had no knowledge, was undertaken by or on behalf of Delta, or that Delta had any specific involvement, control, or expectations with respect to the test. Under these circumstances, it would be inconsistent with the statute's purpose, as discussed in Lawson and as interpreted by subsequent lower court decisions, to impose SOX liability, because the alleged whistleblowing did not concern fraud related to or engaged in by a public company. As the Lawson Court explained, one of the purposes of SOX is to "encourage whistleblowing by contractor employees who suspect fraud involving the public companies with whom they work." 571 U.S. at 449; see also id. at 448 (noting that it is "clear from the legislative record . . . Congress' understanding that outside professionals bear significant responsibility for reporting fraud by the public companies with whom they contract"). Where, as here, the alleged fraud did not involve any activity by a publicly traded company, Defendants' contractual relationship with Delta alone is an insufficient basis upon which to impose SOX liability. See Anthony v. Northwestern Mut. Life Ins. Co., 130 F. Supp. 3d 644, 652 (N.D.N.Y. 2015) (observing that

SOX liability is limited to "situations where a contractor employee is functionally acting as an employee of a public company, and in that capacity, is a witness to fraud by the public company"). Accordingly, Tellez's SOX claim is dismissed.

Dodd-Frank Act

The Dodd–Frank Act prohibits an employer from terminating a whistleblower for "making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002." 15 U.S.C.S. § 78u–6(h)(1)(A)(iii) (LexisNexis 2018). "To sue under Dodd–Frank's anti-retaliation provision, a person must first 'provid[e] . . . information relating to a violation of the securities laws to the [Securities and Exchange] Commission.'" Digital Realty Trust, Inc. v. Somers, 138 S. Ct. 767, 772-73 (2018). Because Tellez did not provide any information regarding the paywall model test to the Securities and Exchange Commission, his Dodd-Frank claim is dismissed.

Subject Matter Jurisdiction

Defendants and Tellez each move for summary judgment on Tellez's breach of contract claim. However, in light of the dismissal of Tellez's federal SOX and Dodd-Frank claims, the Court must examine whether it has independent subject matter jurisdiction of Tellez's breach of contract claim. The Second Amended Complaint asserts that the Court has diversity jurisdiction of Tellez's breach of contract claim, but only alleges that Tellez is a "resident" of New Jersey. (Docket entry no. 20 ¶¶ 2, 20.) "It is axiomatic that, for diversity jurisdiction to be available, all of the adverse parties in a suit must be completely diverse with regard to citizenship." E.R. Squibb & Sons v. Accident & Cas. Ins. Co., 160 F.3d 925, 930 (2d Cir.

1998). For purposes of diversity jurisdiction, "a statement of the parties' residence is insufficient to establish their citizenship." Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 47 (2d Cir. 1996) (citation omitted). Because the pleadings are insufficient to demonstrate an independent basis for subject matter jurisdiction of Tellez's breach of contract claim, the Court grants Tellez ten (10) days from the date of entry of this Memorandum Opinion and Order to file an affidavit demonstrating the existence of diversity jurisdiction at the time this action was commenced. Any responsive submission must be filed within seven (7) days of the date of filing of the affidavit. If the parties' filings are insufficient to demonstrate an independent basis for subject matter jurisdiction of Tellez's remaining claim, the Court will decline to exercise supplemental jurisdiction of the breach of contract claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted to the extent it seeks dismissal of Tellez's SOX and Dodd-Frank claims. Tellez is directed to file, no later than ten (10) days from the date of entry of this Memorandum Opinion and Order, an affidavit demonstrating a basis for this Court's exercise of subject matter jurisdiction of his state law breach of contract claim as of the time this action was commenced. Any responsive submission must be filed within seven (7) days of the date of filing of the affidavit.

SO ORDERED.

Dated: New York, New York
June 3, 2019

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge